# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DUAYNE BROWER,
      Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
      Defendant.

Case No. 1:16-cv-582

Black, J.
Litkovitz, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff Duayne Brower brings this pro se action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying plaintiff's applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 13) and the Commissioner's response in opposition (Doc. 16).

## I. Procedural Background

Plaintiff filed his applications for DIB and SSI in September 2012, alleging disability

since January 1, 2008 due to memory loss, anxiety disorder, and agoraphobia. Plaintiff's

applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a *de novo* video hearing before administrative law judge ("ALJ") Penny Loucas.

Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ hearing. On

November 10, 2015, the ALJ issued a decision denying plaintiff's applications. Plaintiff's

request for review by the Appeals Council was denied, making the ALJ's decision the final

administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 416.920(a)(4)(i)-(v), 416.920(b)-(g)). The claimant has the burden of proof at the first four steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform

the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

> 1. The [plaintiff] met the insured status requirements of the Social Security Act through December 31, 2009.
>
> 2. The [plaintiff] has not engaged in substantial gainful activity since January 1, 2008, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> 3. The [plaintiff] has the following severe impairments: a genetic abnormality of the bilateral hips identified as cam type impingement, bilateral grade 2 chondromalacia, degenerative disc disease, and chronic kidney disease (20 CFR 404.1520(c) and 416.920(c)).
>
> 4. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5. After careful consideration of the entire record, the undersigned finds that the [plaintiff] has the residual functional capacity [("RFC")] to perform medium work as defined in 404.1567(c) and 416.967(c), including the ability to stand or walk about six hours a day, except: he can occasionally climb ladders, ropes, or scaffolds; the [plaintiff] can frequently climb ramps and stairs; he can frequently stoop, crouch, and crawl.
>
> 6. The [plaintiff] is capable of performing past relevant work as an air and hydronic balancing technician. This work does not require the performance of work-related activities precluded by [plaintiff's] residual functional capacity (20 CFR 404.1565 and 416.965).[1]

---

[1] Plaintiff's past relevant work was as an air and hydronic balancing technician, a medium, skilled position. (Tr. 38, 83).

7. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from January 1, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 32-39).

### C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was

otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence

*LifePoint Solutions*

In September 2012, plaintiff sought mental health treatment from LifePoint Solutions for anxiety, depression, and a history of traumatic experiences, including physical abuse. (Tr. 330). On mental status examination, professional clinical counselor Ron Freudenberg noted that plaintiff exhibited mild agitation, moderate depression, moderate anxiety, a mildly flat affect, and a mild impairment of memory. (Tr. 338). Plaintiff's insight and judgment were fair. He reported "hearing mostly indistinguishable voices when drifting off to sleep." (*Id.*). Plaintiff reported "vague escapist [suicidal ideation], most recently a couple weeks ago" but denied any history of suicide attempts. (Tr. 340). Mr. Freudenberg diagnosed plaintiff with anxiety disorder not otherwise specified (rule out posttraumatic stress disorder) and depressive disorder not otherwise specified and assessed a GAF score of 52.[2] (Tr. 342).

Plaintiff attended seven counseling sessions with Mr. Freudenberg between September 10 and October 29, 2012. (Tr. 758-65). On October 1, 2012, plaintiff reported trouble sleeping and problems with physical pain. (Tr. 762). He and Mr. Freudenberg discussed trauma from a work accident and childhood physical abuse. (*Id.*). On October 8, 2012, plaintiff and Mr. Freudenberg discussed techniques for dealing with anxiety and discussed a childhood trauma and "being beaten as a robbery victim a few years ago." (Tr. 761). Plaintiff reported that his

---

[2] A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." *Id.* The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). *Id.* at 34. Individuals with GAF scores of 51 to 60 have "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.*

"physical issues and limitations are worsening." (*Id.*). On October 15, 2012, plaintiff reported having a difficult week and feeling depressed and hopeless. (Tr. 760). On October 29, 2012, plaintiff reported his cousin had died the day before. (Tr. 758). He reported he went to the emergency department due to respiratory problems and pain but refused admission against medical advice due to worries about cost and medical fears. Mr. Freudenberg noted that plaintiff had "trouble finding any positives to discuss." (*Id.*). On November 6, 2012, Mr. Freudenberg noted that he learned from plaintiff's mother that plaintiff was incarcerated. (Tr. 757). On January 21, 2013, Mr. Freudenberg noted that plaintiff had been released and wanted to schedule therapy. (Tr. 756). Mr. Freudenberg was concerned about being objective with plaintiff after seeing news reports about plaintiff's legal issues. Mr. Freudenberg indicated that due to these concerns, he would transfer plaintiff to another therapist. (*Id.*). On March 11, 2013, Mr. Freudenberg discharged plaintiff from treatment due to incarceration. (Tr. 750). Mr. Freudenberg assessed a GAF score of 55 at discharge. He noted that plaintiff's anxiety and depression remained unresolved problems. (*Id.*). He observed that plaintiff had made minimal progress in resolving these issues. (Tr. 751).

*Mercy Hospital*

In October 2012, plaintiff went to the emergency department for chest pain and shortness of breath. (Tr. 352). Emergency physician Michelle Evanko, M.D., noted that plaintiff had a history of asthma, chronic obstructive pulmonary disease ("COPD"), and shortness of breath from toxic exposure in 1994. (*Id.*). One of plaintiff's kidneys was removed when he was 14. (Tr. 353). Plaintiff reported that he occasionally smoked cigars. (*Id.*). On examination, Dr. Evanko noted bibasilar rales in both lungs. (Tr. 354). A CT pulmonary angiogram showed "mild dependent bibasilar groundglass opacity most consistent with atelectasis" and "several

bands of bibasilar atelectasis."[3] (Tr. 355). Dr. Evanko recommended that plaintiff be admitted due to continued chest pain. (Tr. 357). Plaintiff refused admission. (*Id.*). Dr. Evanko diagnosed chronic bronchitis and discharged plaintiff with prescriptions for an albuterol inhaler and antibiotics. (Tr. 358).

On January 4, 2014, plaintiff went to the emergency department for leg pain. (Tr. 623). No abnormalities were noted on examination. (Tr. 625). Plaintiff was discharged with instructions to follow-up with a primary care physician or orthopedist. (Tr. 628).

On January 11, 2014, plaintiff went to the emergency department for lower back pain. (Tr. 682). Plaintiff complained of a three-day history of bilateral lower back pain that radiated down both legs, but was more severe on the right side. (*Id.*). On examination, plaintiff exhibited bilateral paraspinal tenderness and pain. (Tr. 683). Plaintiff's Achilles reflexes were hypoactive bilaterally and his patellar reflex was hypoactive on the right side. (Tr. 684). A chronic right foot drop was noted in plaintiff's gait. (*Id.*).

On March 17, 2014, plaintiff was assessed by physical therapist Dave Miers on referral from pain management physician Sairam Atluri, M.D. (Tr. 837). Plaintiff reported right leg and lower back pain, left leg tingling, and an inability to walk more than five to eight minutes, sit more than ten minutes, or sleep more than three hours. Plaintiff stated that he was unable to take medications secondary to side effects from having only one kidney. (*Id.*). On examination, Mr. Miers noted that plaintiff's posture was poor and palpation caused a pain and withdraw response. (Tr. 838). Mr. Miers noted increased muscle tone of the lumbar paraspinals at the L3-S1 segment. Mr. Miers was unable to test range of motion due to pain response. Mr. Miers observed that all motions were guarded and measured and the right leg had decreased weight bearing in all positions and transitional motion patterns. Mr. Miers was unable to perform

---

[3] Atelectasis is the collapse or closure of a lung.

straight leg tests and flexibility evaluations secondary to pain and plaintiff's inability to get into test positions. (*Id.*). Mr. Miers observed that plaintiff's gait was guarded and antalgic with no heel contact on the right leg, decreased stride length on the right leg, decreased weight bearing on the right leg, and slow cadence. (Tr. 839). Mr. Miers assessed decreased functional mobility, decreased range of motion, decreased endurance, decreased activities of daily living, decreased strength, decreased sensation, and decreased high-level instrumental activities of daily living. Mr. Miers observed that plaintiff presented with significant signs and symptoms of central sensitization and catastrophizing pain behavior. Mr. Miers assessed a prognosis of "[g]uarded; [p]oor." (*Id.*).

A chest x-ray on March 19, 2014 showed low lung volumes with bibasilar airspace disease and was "concerning for pneumonia given history." (Tr. 829).

On March 23, 2014, plaintiff went to the emergency department for headaches and blackouts. (Tr. 892). Plaintiff reported that for the last two years he had experienced chronic headaches and some intermittent three-second blackouts. (*Id.*). Physical examination was unremarkable. (Tr. 895). A CT scan of the brain was normal. Plaintiff was discharged with a referral to a neurologist. (*Id.*).

Pulmonary function testing on March 24, 2014 showed an obstructive and moderate restrictive defect with bronchodilator response and air-trapping. (Tr. 887). Lung volumes were moderately restricted "with a total lung capacity of 4.91 L which is 62% [of] predicted [capacity]." (*Id.*). The test was limited due to coughing and generalized weakness. Plaintiff was unable to perform a six-minute walk. (*Id.*). The respiratory therapist noted that plaintiff was unsteady on his feet and reported going to the emergency department a day earlier for "blacking out." (Tr. 889).

An April 7, 2014 MRI of the cervical spine showed that the spinal canal appeared developmentally small secondary to short pedicles. (Tr. 869). There was mild cord abutment at C3 through C6 and bilateral facet arthropathy was observed at these levels. Foraminal narrowing was observed at multiple levels, appearing greatest proximally at C3-C4 on the left. Diffuse disc bulge-osteophyte complexes were observed at C3 through C7. (*Id.*). An April 7, 2014 MRI of the lumbar spine showed bilateral sacroiliac joint sclerosis and spurring. (Tr. 870). A large benign tumor was suggested within L3. Mild disc bulges were present at L2 through L5. (*Id.*).

On April 12, 2014, plaintiff went to the emergency department for neck, shoulder, and back pain, dizziness, headache, and sharp chest pain with movement. (Tr. 868). Physical examination was remarkable for spinous process tenderness and muscular tenderness in the cervical spine. (Tr. 873). Plaintiff exhibited midline bony tenderness and was diffusely tender in the paraspinal musculature of the midline bilaterally. Plaintiff exhibited decreased range of motion, tenderness, bony tenderness, and pain in the cervical back. (*Id.*). Plaintiff received Dilaudid for pain with good relief and was discharged. (Tr. 874).

An electroencephalogram on April 25, 2014 was within normal limits. (Tr. 864). An MRI of the brain on April 25, 2014 showed mild paranasal thickening but was otherwise normal. (Tr. 865-66).

On March 22, 2015, plaintiff went to the emergency department for right lower back pain extending into his right leg. (Tr. 1622). Emergency physician Michael Argus, M.D., noted that plaintiff walked with a cane because of back pain. (*Id.*). On examination, Dr. Argus noted tenderness in the right sacroiliac joint and minimal paravertebral spasm. (Tr. 1625). Dr. Argus diagnosed sciatica and prescribed Vicodin. (Tr. 1625, 1627).

On March 31, 2015, plaintiff went to the emergency department for right elbow pain. (Tr. 1596). Plaintiff reported that he blacked out and fell onto a coffee table. (*Id.*). On examination, emergency physician Janice Jones, M.D., noted that plaintiff had slight right elbow pain with supination, pronation, extension, and flexion. (Tr. 1600). Dr. Jones also noted mild swelling and mild tenderness to the medial condyle of the ulnar region. (*Id.*). An x-ray of plaintiff's right elbow did not show a fracture. (Tr. 1602). A chest x-ray showed a "[p]ossible left upper lobe pulmonary nodule" and a chest CT was recommended for further evaluation. (*Id.*). The x-ray also showed scarring or atelectasis in the left base. (*Id.*). Dr. Jones prescribed Vicodin and plaintiff was discharged. (Tr. 1603). A chest CT performed on April 20, 2015 did not reveal a pulmonary nodule or acute airspace disease. (Tr. 1594). The CT showed that bilateral lower lobe atelectasis was present, along with scarring in the left lower lobe. (*Id.*).

*Ohio Department of Rehabilitation and Correction*

On intake in February 2013, plaintiff reported smoking one cigar a day. (Tr. 569). His left kidney was removed when he was 14 secondary to trauma from a dog attack. (*Id.*). He reported lower back pain from bone spurs. (Tr. 570).

In April 2013, plaintiff complained of lower right flank pain and frequent urination that had become worse over the past year. (Tr. 548). In July 2013, plaintiff complained of foot and leg pain that had lasted for seven months and was not improving. (Tr. 545). Plaintiff was released from prison in October 2013. (Tr. 512). On release, it was noted that plaintiff would need follow-up treatment "for kidneys." (*Id.*).

*Dr. Wischer Bailey*

In December 2013, consultative physician Jennifer Wischer Bailey, M.D., examined plaintiff for disability purposes. (Tr. 600-07). Dr. Wischer Bailey noted that plaintiff

"ambulates with a stiff mildly limping gait." (Tr. 605). Plaintiff's lungs were clear to auscultation. (*Id.*). Dr. Wischer Bailey noted that plaintiff's respiratory examination "was entirely normal." (Tr. 607). Plaintiff's "[r]ange of motion of the hips was diminished[,] [m]uscle strength was 4/5 over both lower extremities and he had diffuse numbness over both legs." (*Id.*). Plaintiff "had normal range of motion of his spine without tenderness or spasm but moves very stiffly and rigidly." (*Id.*). Based on the examination, Dr. Wischer Bailey opined that plaintiff "appears capable of performing any amount of sedentary work, and at least a mild amount of ambulating, standing, bending, kneeling, pushing, pulling, lifting and carrying heavy objects." (*Id.*). Dr. Bailey opined that plaintiff "would do best in a dust-free environment." (*Id.*).

## Dr. Sexton

In January 2014, consultative psychologist Richard Sexton, Ph.D., evaluated plaintiff for disability purposes. (Tr. 695-702). On mental status examination, plaintiff's "prevailing mood was depressed, and his affect was flat." (Tr. 698). Plaintiff frequently acknowledged feelings of guilt, hopelessness, helplessness, and worthlessness. Plaintiff reported daily panic attacks lasting 35 to 40 minutes "with symptoms involving shortness of breath, racing heart, and feeling like the walls are caving in." (*Id.*). Dr. Sexton noted problems with short-term memory and a "slight impairment in attention span." (Tr. 698-99). Dr. Sexton diagnosed plaintiff with depressive disorder and anxiety disorder and assessed a GAF score of 65.[4] (Tr. 699).

## Dr. Williams

In January 2014, plaintiff saw family medicine physician Donald Williams, M.D., with complaints of bladder control problems and incontinence for several years. (Tr. 1259). Plaintiff

---

[4] Individuals with GAF scores of 61 to 70 have "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 34.

reported that he used his albuterol inhaler two times a day and occasionally smoked cigars. Dr. Williams diagnosed urinary incontinence and asthma and prescribed albuterol, Symbicort (inhaler), Neurontin (used to treat neuropathic pain), and Flexeril (muscle relaxant). (*Id.*). Dr. Williams referred plaintiff to a urologist. (Tr. 1260). On February 7, 2014, plaintiff complained of chronic neck and lumbar pain. (Tr, 1273). Dr. Williams referred plaintiff to a pain management specialist. (*Id.*). On April 29, 2014, plaintiff complained of "dramatic" weight gain, chronic fatigue, recurrent dizziness, chronic dry couth and shortness of breath, frequent urination, chronic neck and low back pain, itchy skin, chronic anxiety and depression, and headaches with recurrent loss of consciousness. (Tr. 1284). Dr. Williams noted that plaintiff saw specialists for all of these complaints. (*Id.*). Physical examination was unremarkable. (Tr. 1284-85).

On May 19, 2014, plaintiff complained that he had "no feeling in either of his feet and they are ice cold." (Tr. 944). Plaintiff also complained of headaches every four hours for two years that were temporarily relieved by ibuprofen and Neurontin. Plaintiff also complained of chronic neck and chest pain. Dr. Williams noted that plaintiff was scheduled to follow-up with specialists concerning these complaints. (*Id.*).

On July 30, 2014, Dr. Williams noted on examination that plaintiff was anxious. (Tr. 1310). Based on laboratory results, Dr. Williams diagnosed hypertension, vitamin D deficiency, and hyperglycemia. (*Id.*). Dr. Williams saw plaintiff for hypertension follow-up appointments on August 13, September 12, and October 13, 2014, for which Dr. Williams prescribed atenolol. (Tr. 1328, 1342, 1357).

In March 2014, plaintiff saw pulmonologist Brent Kinder, M.D., on referral from Dr. Williams. (Tr. 713). Plaintiff reported a dry cough and shortness of breath with minimal activity. Aggravating factors included exertion, exercise, and strong odors. Plaintiff reported "an exercise tolerance of approximately 2-3 blocks on the flat and 1-2 flights of stairs, limited primarily by musculoskeletal complaints and some dyspnea." (_Id._). Plaintiff reported that he smoked one to two cigars daily before quitting one month earlier. (_Id._ at 713-14). Plaintiff's physical examination was unremarkable. (Tr. 715). Dr. Kinder diagnosed shortness of breath, cough, and asthma and ordered pulmonary function tests. (Tr. 717).

On May 20, 2014, plaintiff's physical examination was unremarkable. (Tr. 949). Dr. Kinder continued plaintiff on Flovent and albuterol inhalers. (Tr. 950). On October 24, 2014, plaintiff reported that he had not had a cigar in six weeks. (Tr. 1419). Plaintiff's physical examination was unremarkable. (Tr. 1418). Dr. Kinder continued plaintiff on albuterol and prescribed a Symbicort inhaler. (Tr. 1419).

On April 21, 2015, plaintiff reported that his shortness of breath had been worse for the last two weeks and that he had been using his albuterol inhaler three to four times a day. (Tr. 1634). He reported that he had not been smoking cigars for the last six months. (_Id._). Dr. Kinder noted a few rhonchi on physical examination. (Tr. 1636). Dr. Kinder diagnosed bronchitis and prescribed antibiotics. (Tr. 1637).

_Dr. Murthy_

In January 2014, plaintiff saw psychiatrist Kody Murthy, M.D. (Tr. 720). Dr. Murthy diagnosed major depression, recurrent and prescribed Zoloft (antidepressant) and Seroquel

(antipsychotic used to treat major depressive disorder). (*See* Tr. 720-21). In February 2014, Dr.

Murthy discontinued Zoloft and Seroquel and prescribed Cymbalta (antidepressant). (*Id.*).

<u>*Ms. Osborn Coffey*</u>

In December 2013, plaintiff began seeing mental health therapist Laura Osborn Coffey, a

licensed supervising independent social worker. (Tr. 724). Plaintiff presented with complaints

of depression, stress, and anxiety. (*Id.*). On mental status examination, Ms. Osborn Coffey

noted that plaintiff's mood was depressed, attitude was cooperative and discouraged, attention

was "gained and maintained." (Tr. 726). Ms. Osborn Coffey diagnosed major depression,

recurrent and generalized anxiety. (*Id.*). She assessed a GAF score of 48.[5] (Tr. 727).

On January 6, 2014, Ms. Osborn Coffey noted that plaintiff was depressed and hopeless.

(Tr. 728). Ms. Osborn Coffey assessed a GAF score of 49. (Tr. 729). On January 13, 2014, Ms.

Osborn Coffey noted that plaintiff was "[s]till in a lot of pain." (Tr. 730). She noted that

plaintiff was "[s]till depressed with everything going on, described more panic disorder

symptoms today." (*Id.*). She assessed a GAF score of 49. (Tr. 731). On January 20, 2014,

plaintiff reported daily anxiety, nightly nightmares, and sleep issues "for years." (Tr. 732). On

mental status examination, plaintiff was "still down, depressed, anxious, but willing to talk about

it." (*Id.*). Plaintiff reported problems with short-term memory and an inability to remember

things if he does not write them down. (*Id.*). Ms. Osborn Coffey assessed a GAF score of 50.

(Tr. 733). On January 27, 2014, plaintiff was "very frustrated" about his recent appointment

with Dr. Sexton because "he didn't even give me a chance to explain everything." (Tr. 734).

Ms. Osborn Coffey noted that plaintiff "tends to dwell on negative things that have happened

---

[5] Individuals with GAF scores of 41 to 50 have "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

rather than look ahead to possible positive events or changes." (*Id.*). She assessed a GAF score of 50. (Tr. 735).

On February 6, 2014, Ms. Osborn Coffey noted that plaintiff had received prescriptions for Zoloft and Seroquel from Dr. Murthy. (Tr. 736). He stopped taking the Zoloft because it was causing suicidal ideation. Plaintiff reported "re-living old info in his head, and not much sleep, 2-4 hours/night at best." (*Id.*). Ms. Osborn Coffey noted that they "discussed that he is starting to have some dissociative episodes," possibly related to the Zoloft. (*Id.*). Ms. Osborn Coffey assessed a GAF score of 51. (Tr. 737).

On February 13, 2014, Ms. Osborn Coffey noted that plaintiff was "still limping" and complained of back and leg pain. (Tr. 738). On mental status examination, Ms. Osborn Coffey noted that plaintiff was still depressed. (*Id.*). She assessed a GAF score of 52. (Tr. 739). On February 20, 2014, Ms. Osborn Coffey noted that plaintiff was more tearful and reported having more suicidal ideation when medicated. (Tr. 740). Ms. Osborn Coffey noted that plaintiff "cried a few minutes today, definitely he is not feeling well." (*Id.*). On mental status examination, she noted that plaintiff was "depressed more with all the med[ications] and prob[lems] wit[h] the side effects." (*Id.*). She assessed a GAF score of 50. (Tr. 741).

On February 28, 2014, Ms. Osborn Coffey noted that Dr. Murthy had switched plaintiff to low-grade Prozac for his panic attacks and depression. (Tr. 742). She noted that plaintiff "[w]as definitely limping today when seen in therapy." (*Id.*). Plaintiff reported "ongoing and increased sleeping problems." (*Id.*). Ms. Osborn Coffey assessed a GAF score of 49. (Tr. 743).

On March 7, 2014, Ms. Osborn Coffey noted that plaintiff's limp was worse. (Tr. 1001). On mental status examination, Ms. Osborn Coffey noted that plaintiff was "still down and depressed." (*Id.*). Ms. Osborn Coffey noted that plaintiff reported having nightmares about

suicidal ideation and hanging himself. (*Id.*). She assessed a GAF score of 50. (Tr. 1002). On March 25, 2014, Ms. Osborn Coffey noted on mental status examination that plaintiff was "more depressed and down today, more frustrated." (Tr. 999). She assessed a GAF score of 50. (Tr. 1000).

On April 4, 2014, Ms. Osborn Coffey noted on mental status examination that "[i]n general he presented better today than any other appointment so far, just frustrated with the system." (Tr. 997). She assessed a GAF score of 52. (Tr. 998). Plaintiff reported that he was still having nightmares at appointments on April 24 and May 1, 2014. (Tr. 993, 995). On May 8, 2014, Ms. Osborn Coffey noted on mental status examination that plaintiff was "still down and depressed." (Tr. 991). On May 23, 2014, plaintiff reported that his nightmares "are non-stop and vivid." (Tr. 987). On June 6, 2014, Ms. Osborn Coffey noted that plaintiff "[w]as more scattered than usual today." (Tr. 983). On June 20, 2014, Ms. Osborn Coffey noted on mental status examination that plaintiff's mood was "tired." (Tr. 979). Ms. Osborn Coffey revised plaintiff's anxiety disorder diagnosis to panic disorder. (Tr. 980).

On June 27, 2014, plaintiff reported that he was exhausted and still having nightmares. (Tr. 975). Ms. Osborn Coffey noted that plaintiff's psychiatrist, Bernard DeSilva, M.D., had increased the dosage of three of plaintiff's psychiatric medications. (*Id.*). On July 11, 2014, plaintiff reported that Dr. DeSilva was recommending electroconvulsive therapy. (Tr. 970). On July 18, 2014, Ms. Osborn Coffey noted on mental status examination that plaintiff was "[m]ore tearful today, not ever seen [him] at this level of pain." (Tr. 965). Plaintiff reported having a fall and being hit by a car in a parking lot. (*Id.*). Ms. Osborn Coffey noted that plaintiff was "[n]ot thinking as clearly evident by not telling doctors this week about being hit by car last Sunday." (Tr. 966).

On October 10, 2014, Ms. Osborn Coffey noted that plaintiff admitted "he is down and very negative." (Tr. 1455). She noted that plaintiff was "moving slow today" and "really using his cane." (*Id.*). She observed that plaintiff was "[d]oing as well as he can in current negative medical condition." (Tr. 1456). On October 17, 2014, Ms. Osborn Coffey noted on mental status examination that plaintiff was "a bit lighter in mood today." (Tr. 1452). She noted that plaintiff was "[s]till negative but not so intense today." (*Id.*). She diagnosed major depressive affective disorder, generalized anxiety disorder, posttraumatic stress disorder, and night terrors. (Tr. 1453-54).

On October 23, 2014, plaintiff reported that his other therapist in Dr. DeSilva's office "suggested that he go into hospital and be referred into assisted living." (Tr. 1449). On mental status examination, Ms. Osborn Coffey noted that plaintiff was "[n]ot as upset" but "more down." (*Id.*). She noted that plaintiff was "more rational." (*Id.*). On December 5, 2014, Ms. Osborn Coffey noted that plaintiff was "[d]efinitely more down today." (Tr. 1458).

On May 28, 2015, Ms. Osborn Coffey noted on mental status examination that plaintiff was "[d]own and upset" about his medical treatment and lack of answers. (Tr. 1651). On June 5, 2015, Ms. Osborn Coffey noted that plaintiff was still depressed and "still walking slowly." (Tr. 1653). Plaintiff reported that he was still having nightmares and "almost no sleep." (*Id.*). On June 11, 2015, Ms. Osborn Coffey noted that plaintiff was "still stressed and dealing with self and all physical problems." (Tr. 1656). On June 19, 2015, Ms. Osborn Coffey noted that plaintiff was "[m]ore down this week than last few weeks." (Tr. 1665). On June 25, 2015, Ms. Osborn Coffey noted that plaintiff was "[m]ore forgetful today" and reported nightmares. (Tr. 1668). On July 10, 2015, Ms. Osborn Coffey noted that plaintiff was "[s]ubdued in session today, quieter." (Tr. 1671). She also noted that plaintiff's thought process was "still OK . . . but

not hopeful." (*Id.*). On July 24, 2015, Ms. Osborn Coffey noted on mental status examination that plaintiff was very depressed and very anxious. (Tr. 1739). She noted that plaintiff's "[a]nxiety was high in session today, voice was higher in pitch at beginning of session." (*Id.*).

*Dr. Rousseau*

On January 28, 2014, plaintiff saw urologist Michael Rousseau, M.D., for voiding difficulty and incontinence. (Tr. 793). Plaintiff reported left and right flank pain and urination frequency of every 30 minutes. He reported urination two to three times a night and occasional urgency. Dr. Rousseau noted that plaintiff only had one kidney. (*Id.*). On review of systems, plaintiff reported chills, blurred vision, dizzy spells, headaches, asthma, shortness of breath, and depression. (Tr. 794-95). Physical examination revealed a moderately enlarged prostate but was otherwise unremarkable. (Tr. 795). Dr. Rousseau diagnosed an enlarged prostate with urinary tract symptoms, abnormal urination, and renal agenesis/dysgenesis. (Tr. 796).

*Dr. Contractor*

On April 17, 2014, plaintiff saw neurologist Zainab Contractor, M.D., for migraines. (Tr. 899). Plaintiff reported a history of daily headaches for 17 years since his exposure to toxic mold. Headaches were initially infrequent but had intensified over the years. He reported experiencing blackouts for the last five years. These reportedly last for three seconds and are followed by five to ten minutes of dizziness. (*Id.*). Over the last 28 days, plaintiff reported severe headaches on 24 days and moderate headaches on the other 4 days. (Tr. 900-01). On physical examination, Dr. Contractor noted bilateral tenderness in the frontal, occipital, and temporal regions of plaintiff's head and face. (Tr. 903). Dr. Contractor noted that plaintiff had "weakness in both proximal and distal muscles without a significant Radicular or upper motor neuron pattern." (Tr. 904). Plaintiff was unable to feel light touch and pinprick on all four

extremities. He was unable to toe/heel and tandem walk. Dr. Contractor diagnosed muscle spasms, headaches, blackouts, memory loss, vertigo, neck pain, degenerative narrowing of the cervical spine, lumbar degenerative disc disease, lumbar radicular pain, and depression. Dr. Contractor noted that plaintiff had "significant muscle spasms contributing to his headaches" and that "[u]nderlying spinal pathology also contributes to his headaches." (*Id.*). Dr. Contractor ordered electromyography for further evaluation of plaintiff's muscle weakness. (*Id.*).

On August 21, 2014, Dr. Contractor administered Botox injections to the head and neck muscles for plaintiff's chronic migraines. (Tr. 1372). On October 13, 2014, plaintiff reported that his headaches were unchanged in frequency and slightly improved in intensity. (Tr. 1389). Plaintiff reported "[s]till having vertigo with unsteady gait and had a fall." (*Id.*). Dr. Contractor prescribed tizanidine (muscle relaxant prescribed for migraines) for preventive treatment and Imitrex (migraine medicine) for acute treatment. (Tr. 1393).

In a letter dated September 8, 2015, Dr. Contractor indicated that plaintiff "has tried and failed multiple acute and preventive medications for headaches." (Tr. 1742). Dr. Contractor opined that plaintiff's "headaches and neck pain are associated with a high level of disability at this time." (*Id.*).

*Dr. DeSilva/Mr. Atchley*

In April 2014, Dr. DeSilva prescribed Strattera (ADHD medicine), Viibryd (antidepressant), Valium (benzodiazepine used to treat anxiety and insomnia), Buspar (anti-anxiety drug also used to treat major depressive disorder), hydroxyzine (antihistamine with anti-anxiety properties), and Geodon (antipsychotic medication also used to treat depression, bipolar disorder, and posttraumatic stress disorder). (*See* Tr. 919-20, 932, 997). Included with Dr. DeSilva's records was a biopsychosocial assessment completed by Shawn Atchley, a licensed

independent social worker associated with Dr. DeSilva's practice. (Tr. 935-41). Mr. Atchley diagnosed depressive disorder not otherwise specified and assessed a GAF score of 31.[6] (Tr. 935, 938).

On May 15, 2014, plaintiff began seeing Mr. Atchley for regular therapy sessions. (Tr. 1092). On that date, Mr. Atchley noted on mental status examination that plaintiff's behavior was hypoactive, verbal, and withdrawn, his thought process was tangential, and his affect/mood was hopeless, anhedonic, and worthless. Mr. Atchley also noted that plaintiff was positive for suicidal ideation and expressed "death fantasies." (*Id.*). Mr. Atchley noted that plaintiff "appears to be having difficulty coping with his psychosocial and medical issues." (*Id.*).

On May 21, 2014, Mr. Atchley noted on mental status examination that plaintiff was withdrawn, confused, hopeless, anhedonic, anxious, worthless, and depressed. (Tr. 1093). On May 28, 2014, plaintiff reported vivid nightmares that were "very focused on dead people." (Tr. 1091). Mr. Atchley noted that plaintiff "appears to be having significant difficulty coping with his disease process." (*Id.*). On June 3, 2014, Mr. Atchley noted on mental status examination that plaintiff was confused, angry, sad, anxious, and worthless. (Tr. 1090). On June 11, 2014, Mr. Atchley noted on mental status examination that plaintiff was isolated, hypoactive, confused, angry, hopeless, worthless, and depressed. (Tr. 1089). On June 18, 2014, plaintiff reported feeling "lonely" and "empty" inside. (Tr. 1088). On mental status examination, Mr. Atchley noted that plaintiff was isolated, confused, anhedonic, anxious, and depressed. (*Id.*).

---

[6] Individuals with GAF scores of 31 to 40 have "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV at 34.

*Dr. Atluri*

On May 27, 2014, plaintiff complained of pain in the neck extending into the arms. (Tr. 953). Dr. Atluri noted that an EMG did not show any problems with the upper extremities. Dr. Atluri noted that plaintiff had peripheral neuropathy in the lower extremities and back pain. Plaintiff's physical examination "was unremarkable except for poor motor effort in the cervical spine." (*Id.*). Dr. Atluri administered facet injections. (*Id.*).

On August 12, 2014, Dr. Atluri noted that cervical epidurals and facet injections were not effective. (Tr. 1407). Physical examination "was positive for bilateral weakness in the arms and legs and decreased sensation in the right leg." (*Id.*). Dr. Atluri noted that plaintiff would be scheduled for a lumbar epidural, which was administered on September 25, 2014. (Tr. 1407, 1409).

On October 20, 2014, Dr. Atluri noted that plaintiff walked with a cane. (Tr. 1410). On physical examination, Dr. Atluri noted that plaintiff had tenderness in the spinous processes as well as bilateral paraspinal muscle tenderness, bilateral facet tenderness, and bilateral sacroiliac joint tenderness. Dorsiflexion and plantar flexion were weak on the right side. Dr. Atluri noted that plaintiff's cervical and lumbar MRIs showed moderate changes. Dr. Atluri diagnosed lumbar disc degeneration, lumbar disc displacement, and lumbo-sacral or thoracic radiculitis. (*Id.*).

*Dr. Butt*

On May 28, 2014, plaintiff complained of frequent urination, dizziness with urination, lower back pain, feet numbness, and swelling in the evening to nephrologist Saud Butt, M.D. (Tr. 1008). Physical examination was unremarkable. (Tr. 1009). Dr. Butt diagnosed stage II chronic kidney disease and ordered numerous laboratory tests. (Tr. 1010). These tests showed

that plaintiff's urine osmality of 215 mOsm/kg was abnormally low (normal range 390-1,070 mOsm/kg). Plaintiff's urine creatinine of 2.8 grams per 24 hours was abnormally high (normal range 0.6-2.5 grams per 24 hours). (*Id.*). Also abnormally high were plaintiff's blood glucose level of 112 mg/dL (normal range of 70-99 mg/dL), urine protein level of 0.207 g/24hr (normal range of less than 0.149 g/24hr), and urine sodium level of 279 mmol/24hr (normal range of 40-220 mmol/24hr). (Tr. 1011). Plaintiff's 24-hour urine volume was 3,450 milliliters.[7] (Tr. 1010). On June 16, 2014, Dr. Butt started plaintiff on hydrochlorothiazide to address plaintiff's polyuria (excessive urination) and hypertension. (Tr. 1007). On July 7, 2014, Dr. Butt ordered a cortisol test, which showed that plaintiff's cortisol level was abnormally high. (Tr. 1483).

Laboratory tests on February 2, 2015 showed that plaintiff's blood glucose (125 mg/dL), urine creatinine (2.7 g/24hr), urine protein (0.160 g/24hr), and urine sodium (349 mmol/24hr) were abnormally high. (Tr. 1478, 1481). Plaintiff's 24-hour urine volume was 4,010 milliliters. (Tr. 1481). Dr. Butt noted at a February 26, 2015 appointment that diabetes may be a possible contributor to plaintiff's increased polyuria. (Tr. 1467). Dr. Butt discontinued hydrochlorothiazide because of an increase in polyuria and diabetes concerns. (*Id.*).

Laboratory tests on April 30, 2015 showed that plaintiff's blood glucose (111 mg/dL), urine creatinine (2.9 g/24hr), and urine sodium (424 mmol/24hr) were abnormally high. (Tr. 1513-14). Plaintiff's 24-hour urine volume was 5,175 mL. (Tr. 1514). At a May 4, 2015 appointment, Dr. Butt observed that plaintiff's "[p]olyuria appears to be due to osmotic diuresis." (Tr. 1503).

---

[7] "The normal range for 24-hour urine volume is 800 to 2000 milliliters per day (with a normal fluid intake of about 2 liters per day)." "Urine 24-hour volume," *available at* https://medlineplus.gov/ency/article/003425.htm.

*Dr. Adhikari*

On September 3, 2014, plaintiff saw rheumatologist Tara Adhikari, M.D. for complaints of diffuse body pain. (Tr. 1238). On physical examination, Dr. Adhikari noted that plaintiff had "very heightened sensitivity to pain even with superficial palpation especially in his lower extremities below knees. Pain is out of proportion to physical findings." (Tr. 1241). Dr. Adhikari noted tenderness throughout the spine and paraspinal muscles. Plaintiff's strength was 4+/5 in both upper and lower extremities. He was "tender everywhere not only in fibromyalgia tender points." (*Id.*). Dr. Adhikari noted that plaintiff was found to have a "low titer positive" antinuclear antibody test (test used to evaluate autoimmune disorders) and mildly elevated creatine phosphokinase. (Tr. 1238, 1242). Plaintiff's C-reactive protein level was abnormally high. (Tr. 1247). Dr. Adhikari diagnosed plaintiff with chronic pain syndrome. (Tr. 1243). She observed that she was "unclear into etiology [of plaintiff's pain], probably multifactorial – neuropathy, depression, possible post chemical exposure [with] no clinical evidence of systemic connective tissue or inflammatory disease at this time." (*Id.*).

On March 24, 2015, Dr. Adhikari noted that plaintiff's cervical spine MRI showed multilevel degenerative joint disease and disc bulges. (Tr. 1729). Dr. Adhikari's physical examination was consistent with the findings of the September 2014 physical examination. (*See* Tr. 1731). Dr. Adhikari noted that plaintiff's chronic pain syndrome was of unknown etiology. (Tr. 1732). Dr. Adhikari prescribed Cymbalta (used to treat major depressive disorder, fibromyalgia, and neuropathic pain). (Tr. 1733).

*Dr. Ferree*

On November 20, 2014, plaintiff saw orthopedic surgeon Bret Ferree, M.D., for evaluation of chronic back and leg pain. (Tr. 1433). On examination, Dr. Ferree noted that

plaintiff had "tenderness over his lumbar spine and decreased spinal range of motion." (*Id.*).

Plaintiff's muscle strength and reflexes were normal. He had "mild pain with range of motion of

his right hip." (*Id.*). Dr. Ferree recommended continued treatment with Dr. Atluri. (*Id.*).

*Proscan Imaging*

On April 10, 2015, an MRI of plaintiff's left hip showed cam-type femoroacetabular

impingement morphology, scuffing at the superior through posterior labrum without acute labral

detachment, and a grade 2 chondromalacia in the weight-bearing femoroacetabular compartment.

(Tr. 1551). An MRI of plaintiff's right hip showed a 2.8 centimeter superior labral tear, a grade

2-3 chondromalacia in the weight-bearing hip, and cam-type femoroacetabular impingement.

(Tr. 1552).

### E. Specific Errors

Construing plaintiff's pro se statement of errors liberally, he argues that the ALJ erred in

finding that his asthma, dizzy spells, blackouts, migraines, and depression are not severe

impairments. (*See* Doc. 13 at 3). Plaintiff contends that the ALJ erred by not crediting the

opinions of Dr. Contractor and Ms. Osborn Coffey. (*See id.*). Finally, plaintiff argues that the

ALJ erred by not assessing RFC restrictions related to plaintiff's hip impingement, chronic

kidney disease, asthma, migraines, blackouts, and mental health impairments. (*See id.* at 2-3).

### 1. Substantial evidence does not support the ALJ's finding that plaintiff's breathing impairments, migraines, and mental impairments were not severe.

"[A]n impairment is considered 'severe' unless 'the [claimant's] impairment(s) has no

more than a minimal effect on his or her physical or mental ability(ies) to perform basic work

activities." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 324 (6th Cir. 2015) (quoting Soc.

Sec. Ruling 85-28, 1985 WL 56856, at *3 (1985)). The Sixth Circuit has "observed that the

claimant's burden of establishing a 'severe' impairment during the second step of the disability

determination process is a '*de minimis* hurdle.'" *Id.* at 324-25 (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)). "Under [this] prevailing *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Id.* at 325 (quoting *Higgs*, 880 F.2d at 862).

### a. *Breathing impairments*

The ALJ noted that plaintiff alleged disability due to COPD, asthma, and toxic mold exposure and that a pulmonary function test and diagnostic imaging of his chest were consistent with respiratory disease. (Tr. 32-33). Nevertheless, the ALJ determined these were not severe impairments because "at other times imaging of his lungs were negative, with no evidence of acute airspace disease or a pulmonary nodule." (Tr. 33). The ALJ also noted that plaintiff's "lungs have frequently been clear to auscultation without rales, rhonchi, or wheezes" and plaintiff "also often denied shortness of breath." (*Id.*). Further, the ALJ noted that plaintiff "has frequently reported smoking up to two cigars per day." (*Id.*). In assessing plaintiff's RFC, the ALJ did not include any work-related limitations associated with plaintiff's breathing impairments. (*See* Tr. 35).

Here, substantial evidence does not support the ALJ's finding that plaintiff's breathing impairments were not severe. The record as a whole, including the evidence from plaintiff's treating physicians, pulmonary function testing, and imaging studies, supports the conclusion that plaintiff's breathing impairments were more than "slight abnormalit[ies]" having more than a "minimal effect" on his work abilities. *See Winn*, 615 F. App'x at 324-25. Imaging of plaintiff's lungs consistently showed evidence of a collapsed lung or low lung volumes. (*See* Tr. 352-Oct. 2012, atelectasis; Tr. 829-Mar. 2014, low lung volumes with bibasilar airspace disease; Tr. 1594, 1602-Mar. 2015, scarring/atelectasis). Dr. Kinder, plaintiff's pulmonologist, treated

plaintiff's breathing impairments with regular prescriptions for albuterol and corticosteroid inhalers. (*See* Tr. 950, 1419).

Particularly noteworthy are the results of plaintiff's pulmonary function testing in March 2014, which showed an obstructive and moderate restrictive defect with bronchodilator response and air trapping. (Tr. 887). This test showed that lung volumes were moderately restricted "with a total lung capacity of 4.91 L which is 62% [of] predicted [capacity]." (*Id.*). Significantly, plaintiff's forced expiratory volume ("FEV1") was 1.38 L, which was 32% of predicted volume. (*Id.*). Under Listing 3.02 for pulmonary insufficiency due to COPD, a claimant who is at least 72 inches tall qualifies for disability benefits if his FEV1 value is equal to or less than 1.65 L. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.02(A). The record shows that plaintiff is 73 inches tall, such that his FEV1 value of 1.38 L would meet this listing. (*See* Tr. 899). While the Court recognizes that plaintiff's pulmonary function testing result cannot automatically qualify him for disability under the listing because it does not indicate that three FEV1 values were obtained and does not include the post-bronchodilator FEV1 value, this result still shows that plaintiff's breathing impairments were more than "slight abnormalit[ies]" having more than a "minimal effect" on his work abilities. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(E); *Winn*, 615 F. App'x at 324-25.

In rejecting this objective evidence that plaintiff had a severe breathing impairment, the ALJ noted that at times, imaging of plaintiff's lungs did not show acute airspace disease or a pulmonary nodule. (Tr. 33). Specifically, the ALJ relied on imaging obtained on October 26, 2012 and April 20, 2015. (*See* Tr. 33, 355, 1594). However, even though these images did not show evidence of an acute infection or pulmonary nodule, both the October 26, 2012 and April 20, 2015 CTs showed bibasilar atelectasis. (Tr. 355, 1594). The April 20, 2015 CT also showed

scarring in the left lower lobe. (Tr. 1594). Thus, these images do not constitute substantial evidence that plaintiff's breathing impairments were not severe.

Further, the ALJ noted that at times, plaintiff's respiratory examinations were unremarkable and he often denied shortness of breath. (Tr. 33). In relying on these times when plaintiff was asymptomatic, the ALJ failed to recognize that plaintiff's asthma is episodic in nature. "When a respiratory impairment is episodic in nature, *as can occur with exacerbations of asthma* . . . , the frequency and intensity of episodes that occur despite prescribed treatment are often the major criteria for determining the level of impairment." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00(C) (emphasis added). *See also Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir. 1984) (holding claimant's episodic asthma was a severe impairment because "[r]epeatedly diagnosed asthma, chronic obstructive pulmonary disease, and chronic bronchitis are obviously not slight, insignificant, or meaningless impairments. The Secretary herself lists them as possible *per se* disabling impairments.").

Based on the foregoing, substantial evidence does not support the ALJ's determination that plaintiff's breathing impairments were not severe.

b. *Migraines, dizziness, and blackouts*

As to plaintiff's migraines, dizzy spells, and blackouts, the ALJ found these were not severe impairments because "examinations have consistently been normocephalic and atraumatic" and diagnostic imaging of the brain was "essentially normal." (Tr. 33). The ALJ further noted that plaintiff "has also routinely been observed to be awake, alert, and/or oriented" and "has not required frequent emergency room treatment due to his migraines, dizzy spells, or blackouts." (*Id.*). The ALJ also observed that "[a]t times, [plaintiff] has even denied dizziness, headaches, and/or syncope." (*Id.*). In assessing plaintiff's RFC, the ALJ did not include any

work-related limitations associated with plaintiff's headaches, dizziness, or blackouts. (*See* Tr. 35).

Here, substantial evidence does not support the ALJ's determination that plaintiff's migraines, dizziness, and blackouts were not severe. The record shows that plaintiff went to the emergency department in March 2014 for headaches and blackouts. (Tr. 892). Plaintiff was discharged with a referral to a neurologist. (Tr. 895). In April 2014, Dr. Contractor, plaintiff's neurologist, diagnosed headaches, blackouts, and vertigo. (Tr. 904). Dr. Contractor noted that in the last 28 days, plaintiff reported severe headaches on 24 days and moderate headaches on the other 4 days. (Tr. 900-01). In August 2014, Dr. Contractor administered Botox injections, which only slightly improved the intensity of plaintiff's headaches. (Tr. 1372, 1389). Dr. Contractor prescribed tizanidine and Imitrex to treat plaintiff's headaches. (Tr. 1393). In March 2015, plaintiff went to the emergency room for treatment of an injury to his arm from blacking out and falling onto a coffee table. (Tr. 1596). In September 2015, Dr. Contractor indicated that plaintiff "has tried and failed multiple acute and preventive medications for headaches." (Tr. 1742). Dr. Contractor opined that plaintiff's "headaches and neck pain are associated with a high level of disability at this time." (*Id.*).

This record evidence shows that plaintiff's headaches, dizziness, and blackouts were more than "slight abnormalit[ies]" having more than a "minimal effect" on his work abilities. *Winn*, 615 F. App'x at 324-25. *See also Meyers-Schreiner v. Astrue*, No. 08-cv-573, 2009 WL 890691, at *4 (D. Colo. Mar. 31, 2009) (finding "the record clearly documented that Plaintiff had [severe impairments of] headaches and migraines" where doctors "diagnosed and treated Plaintiff's headaches"). The ALJ's reliance on the lack of abnormal examinations, diagnostic imaging, and electroencephalograms was not a proper basis for finding that plaintiff's headaches

were not severe. *See id.* ("[H]eadaches and migraines are not generally proved through diagnostic or laboratory tests but are diagnosed through medical signs and symptoms.") (citing *Thompson v. Barnhart*, 493 F. Supp.2d 1206, 1215 (S.D. Ala. 2006); *Wiltz v. Barnhart*, 484 F. Supp.2d 524, 532 (W.D. La. 2006); *Ortega v. Chater*, 933 F. Supp. 1071, 1075 (S.D. Fla. 1996)). *See also Pennington v. Chater*, No. 96-5177, 1997 WL 297684, at *3 (10th Cir. Jun. 5, 1997) ("We are aware of no medical procedures to objectively evaluate either the severity of a migraine or pain; and where no such conclusive tests exist, the failure to produce such test results is surely an improper basis for discrediting a claimant's uncontroverted testimony.").

Based on the foregoing, substantial evidence does not support the ALJ's determination that plaintiff's migraines, dizziness, and blackouts were not severe.

### c. *Mental impairments*

As to plaintiff's mental impairments, the ALJ found these were not severe. (Tr. 33). The ALJ acknowledged that plaintiff once received a GAF score of 31, but found this score to be inconsistent with other GAF scores that ranged from 52 to 65. (Tr. 33-34). The ALJ discounted the GAF scores of 48 to 52 that Ms. Osborn Coffey regularly assessed because she was not an "acceptable medical source." (Tr. 34). The ALJ noted that plaintiff was often found to have normal or appropriate mental health findings on examination. The ALJ also found that plaintiff's mental health treatment was sporadic as he did not seek mental health treatment from January 2008 until September 2012 or from October 2012 until December 2013. (*Id.*). In assessing plaintiff's RFC, the ALJ did not include any work-related limitations associated with plaintiff's mental impairments. (*See* Tr. 35).

Here, substantial evidence does not support the ALJ's determination that plaintiff's mental impairments were not severe. The record shows that plaintiff attended seven therapy

sessions with professional clinical counselor Ron Freudenberg between September 10 and October 29, 2012. (Tr. 758-65). Mr. Freudenberg diagnosed plaintiff with anxiety and depression and assessed a GAF score of 52. (Tr. 342). Due to his incarceration, plaintiff stopped seeing Mr. Freudenberg after his October 29, 2012 session. (*See* Tr. 757).

Plaintiff was released from prison in October 2013. (Tr. 512). In January and February 2014, plaintiff saw psychiatrist Dr. Murthy, who diagnosed major depression, recurrent and prescribed a number of antidepressants. (Tr. 720-21). In December 2013, plaintiff began seeing mental health therapist Laura Osborn Coffey, who diagnosed major depression, recurrent and generalized anxiety. (Tr. 726). After his initial session, plaintiff continued to see Ms. Osborn Coffey on a near-weekly basis. (*See* Tr. 729-43, 965-1002, 1449-58, 1651-71, 1739). Ms. Osborn Coffey consistently noted symptoms of depression and anxiety on mental status examination. (*See id.*). In addition to Ms. Osborn Coffey, plaintiff concurrently began attending regular therapy sessions with therapist Shawn Atchley in May 2014. (*See* Tr. 1088-93). Mr. Atchley diagnosed depression and assessed a GAF score of 31. (Tr. 935, 938). Mr. Atchley regularly noted on mental status examination that plaintiff was withdrawn, confused, hopeless, anhedonic, anxious, worthless, and depressed. (*See* Tr. 1088-93). In addition to seeing two therapists, psychiatrist Dr. DeSilva began treating plaintiff with six different mental health medications in April 2014. (*See* Tr. 919-20, 932, 997).

In short, the medical evidence shows that plaintiff was taking a bevy of psychiatric medications for his mental impairments and regularly attended therapy with two different therapists. The ALJ's reliance on "normal" mental health findings on examination to the exclusion of the evidence showing clinical findings consistent with "severe" mental illness is inconsistent with the longitudinal evidence of plaintiff's mental impairments. The Social

Security regulations recognize that a claimant's level of functioning may vary considerably over time and that longitudinal evidence is required in the case of mental impairments. 20 C.F.R. Pt. 404, Subpt. P, App. 1, 12.00(D)(2). As the level of functioning at any specific time may seem relatively adequate or, conversely, rather poor, proper evaluation of plaintiff's mental impairments must take into account variations in levels of functioning in determining the severity of his impairments over time. *Id.* When viewing the record as a whole, substantial evidence does not support the ALJ's conclusion that plaintiff's mental impairments were not more than "slight abnormalit[ies]" having more than a "minimal effect" on his work abilities. *Winn*, 615 F. App'x at 324-25.

In finding that plaintiff's mental impairments were not severe, the ALJ rejected Ms. Osborn Coffey's GAF scores consistently ranging between 48 and 52 because she is not an "acceptable medical source." (Tr. 34). Substantial evidence does not support the ALJ's treatment of Ms. Osborn Coffey's assessments. Licensed independent social workers, like Ms. Osborn Coffey, are not "acceptable medical sources" and instead fall into the category of "other sources." *Wilson v. Astrue*, No. 08-cv-216, 2009 WL 1505534, at *6 (E.D. Ky. May 27, 2009) (citing 20 C.F.R. §§ 404.1513(d), 416.913(d)). Information from such sources "may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.* Information provided by such sources is "important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at *3. It may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for her opinion. *Id.* at *5. Ms.

Osborn Coffey had the most frequent and long-standing treatment relationship with plaintiff of all his mental health providers. Given this special relationship, the ALJ erred in rejecting her assessments solely because she was not an "acceptable medical source." *See id.* at *6.

Further, even if the ALJ's reliance only on GAF scores ranging from 52 to 65 was proper, these scores also support finding that plaintiff's mental impairments were severe. (*See* Tr. 34). Such scores are indicative of mild to moderate symptomatology, i.e., more than a "slight abnormality." *See* DSM-IV at 34; *Winn*, 615 F. App'x at 324-25. Additionally, the ALJ found that plaintiff's mental impairments were not severe because he did not begin seeking mental health treatment until September 2012 and did not seek treatment between October 2012 to December 2013. (Tr. 34). While this may be relevant to the determination of the onset date of plaintiff's mental health impairments, it does not constitute substantial evidence that plaintiff's mental health impairments were not severe at any time.

In sum, given the record evidence of plaintiff's frequent and extensive mental health treatment from December 2013 onward, substantial evidence does not support the ALJ's determination that plaintiff's mental health impairments were not severe.

### d. *Harmless error analysis*

The Sixth Circuit has explained that the failure to find a particular severe impairment at step two of the sequential evaluation process does not constitute reversible error if an ALJ finds at least one severe impairment and considers a plaintiff's other impairments in assessing the RFC. *See Maziarz v. Sec'y of HHS*, 837 F.2d 240, 244 (6th Cir. 1987). Here, however, the ALJ failed to assess any RFC limitations associated with the additional severe impairments analyzed above. (*See* Tr. 35-37). Thus, the ALJ's failure to include plaintiff's breathing impairments, headaches, dizziness, blackouts, and mental impairments in the list of plaintiff's severe

impairments constitutes reversible error. *See Winn*, 615 F. App'x at 326 (holding the ALJ's failure to find particular severe mental impairments at step two of the sequential evaluation process was reversible error because the ALJ "did not consider [plaintiff's] mental impairments in a meaningful way" when assessing plaintiff's RFC).

Thus, plaintiff's assignment of error should be sustained and this matter should be reversed and remanded for further proceedings. On remand, the ALJ should be instructed to re-weigh the evidence as to all of plaintiff's severe impairments and reassess plaintiff's RFC accordingly.

### 2. The Court need not reach plaintiff's remaining assignments of error.

It is not necessary to address plaintiff's remaining assignments of error. Because this case should be remanded for the ALJ to re-weigh the evidence as to all of plaintiff's severe impairments and reassess plaintiff's RFC accordingly, this may impact the remainder of the ALJ's analysis. In reassessing plaintiff's RFC to incorporate all of plaintiff's severe impairments, the ALJ will also need to reweigh the medical opinions of record, reassess plaintiff's credibility, and pose proper questions to a VE. In any event, even if plaintiff's remaining assignments of error have merit, the result would be the same, i.e., remand for further proceedings and not outright reversal for benefits. *Mays v. Comm'r of Soc. Sec.*, No. 1:14-cv-647, 2015 WL 4755203, at *13 (S.D. Ohio Aug. 11, 2015) (Report and Recommendation) (Litkovitz, M.J.), *adopted*, 2015 WL 5162479 (S.D. Ohio Sept. 3, 2015) (Dlott, J.).

### III. This matter should be reversed and remanded for further proceedings.

In determining whether this matter should be reversed outright for an award of benefits or remanded for further proceedings, the undersigned notes that all essential factual issues have not been resolved in this matter. *Faucher v. Sec'y of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). On

remand, the ALJ should (1) re-weigh the evidence as to all of plaintiff's severe impairments; (2)

re-weigh the medical opinions of record; (3) reassess plaintiff's RFC and credibility; and (4)

pose an appropriate hypothetical or hypotheticals to a VE after properly assessing plaintiff's

RFC.


**IT IS THEREFORE RECOMMENDED THAT**:

The decision of the Commissioner be **REVERSED** and **REMANDED** for further

proceedings consistent with this opinion.

Date: _8/14/17_

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DUAYNE BROWER,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:16-cv-582

Black, J.

Litkovitz, M.J.

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,* 474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).